Good morning, your honors. May it please the court. My name is Michael Cunningham. You have the name known as Mr. Elghasen. I'd like to reserve some time for me, Bob. How about a two? 20 minutes. Five? You only want to use five? Five. Okay. May it please the court. Is you. In this case, it is whether the district court erred when it dismissed Mr. Elghasen's personal jurisdiction over RBS within Nevada. Right. Independent of those, with context to Nevada State, independent of its context to Mr. Elghasen in person. Well, frankly, you have to satisfy the problems of our specific jurisdiction test, right? Absolutely. If you're not arguing general jurisdiction here, you're arguing specific jurisdiction. That's correct. Okay. And we've stated what the specific jurisdiction factors are. And then the Supreme Court came out and reminded us that they were still in charge and said in Walden v. Fiori, it's a mixture of stuff. We have to put on those factors, right? Well, then, we have found cases where they existed before you. Well, okay. You can put it the way you want to. It seems to me that our case law was, to some extent, staged with Walden. But go ahead and tell me how you made the first factor. So the first, Walden reaffirmed that was the denying surrogate, right? And that is repeatedly beforehand. Even in the Walden decision, there has to be something more expressive. Although in Walden, denying surrogate, you misapplied it and it wasn't in its vision. That's the Supreme Court health. Can you tell me what's happened in Walden v. Myers? Walden had an effect on Myers, but it didn't go for all Myers. Myers is still good law. Well, it seems to me that since Myers, Walden came out that we have to look at it just a little bit differently. You would agree? Yes, absolutely. So now, instead of the expressive factor, so right now, instead of looking at it towards the arms, the claims that we need to look at that, the arm, the connections to the firm itself. But again, that's real burglaging. That's from both cases beforehand. That was out there before. So looking to the facts, and in this case being Walden, looking to the facts in this case, how did RBS purposely avail or direct its activities toward Nevada? Sure. The purposeful direction to Nevada started when RBS Computer had contracted and agreed with these three Nevada leading home companies that RBS is going to report information for these companies about consumers in Nevada. These three accounts were opened in Nevada, in Nevada stores located in Nevada. That's the way they opened, by the country openers. They were opened by Family Finance, which is a payday loan company in Nevada, Gentry Finance, and Goldoan Loans. These are local payday loan companies which confronts a Nevada that Mr. Elderson walked into and opened up accounts. He lived in Nevada at all times. So what did RBS have to do with those companies anyway? Well, at this stage, at most, at this stage, there was no jurisdictional discovery. All we know at this point is that they had some contact with these three companies and agreed to report information about consumers for these three companies. And the record supports that. It's how business credit reports show RBS reporting information about these three Nevada companies. That contact with those three companies is completely independent from RBS's claim. I can see how you can make that argument before Walden. But I could argue it after Walden. Well, let's put it in other words. If Mr. Elderson was to move to New York, is there still a connection to Nevada? The answer is, of course. RBS has a contract, an agreement, with these three payday loan companies in Nevada. That contact and that connection to Nevada, the state, is completely independent from Mr. Elderson. We're not saying only that Mr. Elderson was harmed or that RBS connected to Mr. Elderson specifically. We're saying that they had this connection to these payday loan companies, these businesses that are operating in Nevada. In addition, has a substantial connection with Nevada. Well, absolutely. This out-of-state company, which has been to Nevada, and it has a contract and a connection with these three companies to report information. But on top of that, the connection is not a long-term connection. Every single one, RBS has to, again, reach in to update, because what is Mr. Elderson's credit report right now? It was updated and corrected. And the record reflects that over a period of time that RBS was reporting, the balances were changed. So if Mr. Elderson walked into Family Finance and paid $100 for one of the loans, RBS and Texas would have to reach out to Family Finance in Nevada and say, Hey, what's the status on this account? And that would have to happen every single one. Well, it seems to me that you rely a lot on buyers for your argument here. But if I look at Walden, it seems to me that Walden had a similar kind of circumstance as what you have here, and so there was nothing. You couldn't make a version wrong. Well, in Walden, the only connection to Nevada was that money was taken in Georgia and it was taken from people who happened to live in Nevada. As the Supreme Court points out, if those people lived in New York or some other state, then there would be personal jurisdiction in those states because the officer in Georgia would know about them. In this case, it's completely different. RBS, the defendant in this case, has contracts and agreements with three individual PD loan companies, and it's completely different from Mr. Nelguson to report information on their credit reports. But what is the business of the defendant? It's unclear, but it's alleged in the complaint that they were reporting in order to fund the debt in Nevada. So either a tax collector or those briefings by the defendant does raise some questions. It's actually very vague about what they do. But the taxes come with them. Yes. With these orders of taxes. That's right. And it's in the business of reporting on or assisting in debt collection, either nationwide or in one of the places. All we know is that he was reporting for debt collection purposes in Nevada in this case. We don't know from other places. So, Elizabeth, your second, we've heard what your argument is. Your second is that somehow RBS veiled itself of conducting business in Nevada by conducting business and sharing officers with Nevada entities. Well, I understand that they may share corporate officers with or be related to Nevada entities, but I didn't see anything in here that says that RBS conducts business with those entities. The reason we raised it is to just show that RBS is being vague about what they're doing, and we know that there's this history. So this is really not a random hearing argument. It says there's really nothing to sell that RBS conducts business with those entities. RBS has anything to do with those entities. It's just there's corporate officers that are shared. And in short, it just highlights the point that I was making before. RBS has contacts with these three companies. Exactly what those contacts are, whether it is those corporate officers, which we believe it is, and the record supports it, or whether it's separate entities and they've been connected to some contacts. So UW could even allege that there's any more than there's just a sharing of officers? Well, we have a pledge in the record that supports that RBS is reporting for these three companies. So the record does support that there are agreements, some agreement that RBS acquired the right to report information about consumers in Nevada. Let's look at your third. You say the bankruptcy notice was sent by the bankruptcy court list, family, finance. You say that RBS requested this notice. In order to say RBS requested this notice, don't you have to have some imputation, I guess, from family, finance, RBS? Sure. And the record supports that RBS and family finance were both reporting together, or that RBS was reporting for family finance on Ms. Allison's credit report, and that's the record. So the only thing you got that connects them is RBS sent a credit report and then to family finance. No, Your Honor. RBS has an agreement with family finance. Family finance is made up of the RBS reports on consumers' credit reports. We have the family finance understand that this is a bad job. They also sent in another bankruptcy court to file a proof of claim. RBS didn't file a proof of claim. Well, someone did, but RBS didn't. Family finance requested a notice, as I understand it, NER 3031. With RBS' texts and address on there. And then the final point is they also, again, once they've received Ms. Allison's credit report, they also reached out to them to obtain credit. Did I say my time is up? I guess I'll ask you one question, if I may, and give it a hundred times up. There's an Experian report that actually lists Mr. Helgeson with addresses in Indiana, California, and Michigan. What is it to show that you even knew, or that RBS even knew that Helgeson was a resident of Nevada? I'm not seeing any words. It says that there's Indiana or Michigan addresses on the credit report. There are complaint letters that all take relevance. Ms. Allison lived in Nevada. These loans were opened up in Nevada. That is undisputed. Okay, great. Thank you. Good morning, Justices. You have to use the card. I can say that. I'll stop you right now. There's no justice in the 9th Circuit Court. This is just judgment. All right. Good morning, Your Honors. Kiki Weber on behalf of Defendant Affiliate, RBS Computer Incorporated. I wanted to start by making some clarifications based on the previous questions that were asked. RBS Computer, and this is not a staff that was on the record, but I think it's warranted by the questions that came up, it is a company that is basically a computer company that takes data that's provided to it and converts it into a form that then is appropriate for sending off to the credit bureaus. And, in addition, provides some bookkeeping to the court, which is in the record. And so I think that's important because there was a representation that RBS directs information to the credit bureaus every month. And what actually happens is that the clients of RBS, one of which is family finance, one of which is called a loan, they provide the data to RBS. I mean, it's sent to their offices in Texas. And then that data is converted. There isn't an individual at RBS that looks at the data. It is simply converted into a format that's appropriate to go on then to the credit bureaus. It's not done by the computer, is it? It's essentially done by computer, correct. And so I think my opposing counsel acknowledges that originally in this case there was an allocation that RBS somehow acquired these loans or purchased these loans. And we have facts in the record below, a declaration that says no, they actually don't own any loans. They're just dealing with the loan owner's data, essentially, is what that means. And so. What he's saying is the very fact that there's some kind of a conflict between those entities in Nevada with RBS is enough to say that they meet the first five terms. Well, and of course we disagree. You said you disagreed, but now explain. Simply having a contract with a Nevada entity is not enough to subject you to the personal jurisdiction of Nevada courts. Under the first probe. Under the first probe. Given what case? Well, I would say under Weldon especially, but even under Myers, which I don't think is good law anymore after having lost at least to the extent that you can look at just the kinds of squandered entities we have in Nevada. I think what's important is under the first probe, you're talking about purposeful direction or purposeful development to the extent that providing credit reporting information to the credit bureaus is the purposeful direction. And I think it needs to be understood that the information that RBS was providing, which is the issues of data that it received from someone else, was not directed to Nevada. It was directed to credit bureaus. In this case, Experian, which is not a Nevada company. It has no Nevada offices. That is also in the record. Is there a relationship between, is there a corporate relationship between RBS and the Nevada companies? No, there is no corporate relationship. They're not subsidiaries. They're not parent companies. They're not brother-sister companies. They're not brother-sister companies. They're family finance and gold owner separate companies from RBS. I think the opposing counsel below provided information about a different entity, which doesn't appear to have anything to do with these laws of issue here, Gentry Finance, suggesting that they have some of the same principles RBS and Gentry Finance does. But again, these are completely separate companies. This isn't in the record. We don't believe it's necessarily in the record, but for the Board's information. They keep separate books, separate corporate minutes, and there hasn't even been an allegation that they're somehow alter egos of each other. These are simply separate companies doing separate things. Is this case factually at least a little different than Walden? Factually, it is different. I think the underlying holding in Walden is still going to control, which is you cannot just look at the plaintiff's contacts with the forum state in order to determine whether there was purposeful development. And I think that's essentially what Myers did. Myers, which was relied on very heavily by my opposing counsel, Myers said, well, the harm of a company pulling a credit report in one state is going to be felt in the plaintiff's home state, and therefore, there is purposeful development here. I think even if Myers is still wrong, it doesn't apply on that basis, because in Myers there was some indication that the company that was pulling the credit reports knew, well, by virtue of the fact that they were pulling a credit report of that particular person, they knew that their effects were going to be felt in the forum state. That is not the case here. My client has no knowledge as to the residence of the plaintiff. Again, there's no one reviewing this data as it comes in. It merely comes in, is converted, and is sent off. So they would have had no reason to know that the activity that they're alleged to be doing, which is simply making a report to a dispariant, would have any effect in the matter. Let me go to the second test. It rises out of or relates to activities conducted. It's my understanding, and I guess I'm pretty sure, that the only thing RBS did was send information from its office in Texas to a disparian, an entity with no Nevada offices. Is that true? That is correct, Your Honor. If the claim arises out of what is alleged to be inaccurate credit reporting, then every action that RBS took was not related to Nevada at all. The data that it had in its possession that it provided to a disparian, again, it would have done that providing from Texas. It would have gone to a disparian. Is it contrary to Myers? I think the difference in Myers, the distinction that was made, well, it wasn't even credit reporting in Myers. It was someone had pulled a credit report. And I think that differs from this case because you would have had to actually know who you were trying to get credit reporting info about, so presumably you knew where they lived when you pulled that. Again, this is basically an automated process, and you would have no way of knowing that this particular debtor was a Nevada resident or not. If your opposition had met one of the two prongs, and we were to look at the third prong, what's the best argument on the third prong? Well, there are a lot of factors to consider, some of the factors we argued in our report. My worry about the third prong is simply that if you're going to get in this business of giving credit information to people in the United States, it doesn't seem exactly fair to make them chase you to Texas to sue you for doing something wrong. Well, I would agree with that. And I think they're so removed from, we're talking about a loan that appears to still be owned by Family Finance and or pulled a loan, a consolidated case. Why weren't those parties named here? They appear to be Nevada entities. I think we have a much stronger case for personal jurisdiction against those parties. It is, I would argue, unreasonable to name this party that merely took the data of those entities and provided it to the credit bureaus in Texas. And now, because they did that, we're going to haul them into Nevada to litigate this case. If we're just talking about reasonableness, I think that's clearly unreasonable, without even going into all of those other factors. But we did lay out in our briefing why we think the majority of those factors. These are the three important reasons we think it's unreasonable to do that. Well, yeah, I think so, yes. I mean, if 25 years ago you wouldn't have a company like yours who would gather all this data around the country and set it up on a worldwide map and make it available to companies who are in Nevada and 49 other states. Correct. It's different. So it's a new world in which we live. Well, why would you engage in a business which touches electronically every state and tells you, therefore, then to mail yourself to suit, to put yourself in a position of being sued in all those states by somebody who may have been harmed by inaccurate data? You know, this case is not cited in our briefing because, frankly, I'm not sure it's relevant because it goes to general jurisdiction. But your comment brings to mind a very recent U.S. Supreme Court decision that came out regarding one of the railroads that is escaping me right now. We're talking within the last month. And that was a case where someone had sued a national railroad in Montana, arguing that this railroad goes through every state and I should be able to sue it everywhere. And the U.S. Supreme Court said, no, you can't. You've got to show more than that. There's always special protections for railroads. Railroads have always been treated differently by Congress. We need to start with credit reporting instead. Well, but I don't know that Congress has said that we're going to sue credit reporting from other businesses. Well, and I don't think that any statutory authority in this U.S. Supreme Court case I'm talking about, and I apologize, but I don't have the citation. I don't think there was any statutory factor that went into that decision to my recollection. My time is out. Unless you have any further questions. Thank you very much for your brief and thorough presentation. We appreciate it a whole lot. Counselor, I'm going to give you a chance for a while. I just want to thank you, Your Honors. I just want to quickly address the new information that was raised that is not on the record. The thing that this information that's not on the record highlights the need for jurisdictional discovery in this case, if the Supreme Court is inclined to find that there was no, that Ms. Davidson's burden hasn't been met. This court should be manned to require additional discovery. There are many issues in this new. Where did RBS Computer think Ms. Davidson lived? What did they think they were doing? All these disconnections in the matter, the contracts, the corporate entities, the proof of claim in the bankruptcy court, all this information could have been discovered and should have been discovered in the lower court. It was not the district court found that the fiscal location of RBS was sufficient. For those reasons, we ask that this court reverse the district court. Thank you very much for your argument. This case, Case 1516283, Helgeson v. RBS, is submitted.
judges: Fisher, Schroeder, N.R. Smith